**Charles A. WILLIAMS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 13718.**

District of Columbia Court of Appeals.

Argued Oct. 24, 1979.

Decided Sept. 29, 1980.

Martin S. Echter, Washington, D.C., for appellant.

Jay B. Stephens, Asst. U. S. Atty., Washington, D.C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry and E. Thomas Roberts, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. Constantine J. Gekas, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before KELLY, GALLAGHER, and PRYOR, Associate Judges.

GALLAGHER, Associate Judge:

Appellant was convicted after a jury trial of carrying a pistol without a license (D.C. Code 1973, § 22–3204). On appeal, he contends (1) the trial judge erred when she failed to bar the use of appellant's prior conviction for second degree murder; (2) trial counsel's failure to locate and present a witness denied him the effective assistance of counsel; and (3) he was denied his Sixth Amendment right to a speedy trial. We affirm.

At trial [1] the government presented testimony of the two arresting officers who stated that at about 1:40 p. m. on December 10, 1975, they observed appellant and another man walking in the vicinity of a Safeway store in the neighborhood of 12th and Shepherd Streets, N.E. While the two men were under surveillance, one of the officers noticed a bulge in appellant's right front pants pocket. The officers thereupon stopped appellant and his companion. Appellant removed his hand from his pants pocket at the request of one of the officers, revealing the butt of a .32 caliber pistol. The officer seized the pistol and placed appellant under arrest. According to the officers' testimony, appellant's companion, a Mr. Fisher, was searched and questioned, but released at the scene.

Appellant testified that on the day of the offense he drove alone to the home of his half–brother's girl friend, a Ms. Russ. After parking the car and while walking to the house, appellant and two passersby were stopped by a police scout car. All three were asked for identification. Appellant was arrested in response to erroneous information received by radio that he was an escapee. One of the arresting officers then went to some nearby bushes and picked up a gun, and told appellant it was his (appellant's) gun. Ms. Russ and appellant's half–brother, Mr. James A. Watkins, Jr., testified on behalf of appellant that

---

1. This trial, which commenced on April 11, 1978, was appellant's second for this offense. An earlier trial in April 1976, ended in a mis-trial when the jury was unable to reach a unanimous verdict.

they had seen a policeman retrieve a gun from the bushes surrounding Ms. Russ' yard during the time that appellant was stopped by the police.

On cross examination, appellant was impeached with a prior conviction for second degree murder.[2] He contends such use of his prior conviction was unconditionally barred by D.C. Code 1973, § 14–305(b)(2)(A)(ii) which provides:

(2)(A) Evidence of a conviction of a witness is inadmissible under this section if—

(i) the conviction has been the subject of a pardon, annulment, or other equivalent procedure granted or issued on the basis of innocence, or

(ii) the conviction has been the subject of a certificate of rehabilitation or its equivalent and such witness has not been convicted of a subsequent criminal offense.

While appellant was serving his prison sentence for the 1965 conviction, the District of Columbia Parole Board formally requested the trial court in that case to reduce appellant's minimum sentence pursuant to D.C. Code 1973, § 24–201c. That section provides, in pertinent part:

When by reason of his training and response to the rehabilitation program of the Department of Corrections it appears to the Board that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, and that his immediate release is not incompatible with the welfare of society, but he has not served his minimum sentence, the Board in its discretion may apply to the court imposing sentence for a reduction of his minimum sentence. The court shall have jurisdiction to act upon the application at any time prior to the expiration of the minimum sentence and no hearing shall be required.

The Parole Board's request was granted and appellant received an early parole. Appellant contends this grant by the trial court of a reduction of his minimum sentence pursuant to § 24–201c is the equivalent of a certificate of rehabilitation, barring impeachment use of the conviction under § 14–305(b)(2)(A)(ii).

Focusing on the language of § 24–201c, which provides relief "by reason of [a prisoner's] training and response to the rehabilitation program of the Department of Corrections," appellant asserts that this statute is the only formal procedure by which the District of Columbia government can recognize an individual's rehabilitation from crime.[3] Appellant argues that the language conditioning relief on considerations of rehabilitation, as well as the fact that invocation of the statute both requires affirmative steps by the Parole Board in making the application and requires a formal ruling by the trial court, distinguish § 24–201c from the parole procedure in D.C. Code 1973, § 24–204(a).

Whenever it shall appear to the Board of Parole that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with

---

2. Appellant was convicted in 1965 in the United States District Court of second degree murder and attempted robbery. At trial for the instant offense, the prosecutor attempted to impeach appellant with conviction for petty larceny and robbery, but appellant insisted on correcting him:

Q. Are you the same Charles Williams who was convicted of petty larceny in 1965?
A. Petty larceny in 1965 and also second degree murder in 1965.
Q. And robbery?
A. It wasn't no robbery. It was second degree murder.
Q. Second degree murder and robbery?
A. It wasn't no robbery. Look at the thing. It was second degree murder and they say

something about it may be attempted robbery. It was never no motive for robbery.
Mr. Roberts: I have no further questions of this witness, Your Honor.
The court then gave a limiting instruction. (Tr. 81–82.)

3. D.C. Code provisions governing rehabilitation programs for alcoholics, § 24–521 *et seq.*, and for users of narcotics, § 24–601 *et seq.*, do not expressly provide for certificates of rehabilitation. The Federal Youth Corrections Act, however, does provide for a certificate evidencing the set–aside of a conviction. 18 U.S.C. § 5021 (1976). See note 8 *infra.*

the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence, as the case may be, the Board may authorize his release on parole upon such terms and conditions as the Board shall from time to time prescribe. While on parole, a prisoner shall remain in the legal custody and under the control of the Attorney General of the United States or his authorized representative until the expiration of the maximum of the term or terms specified in his sentence without regard to good time allowance.

Thus, appellant concludes, the grant by the trial court of the Parole Board's application for a reduction of a prisoner's minimum sentence so as to make him eligible for early parole (under § 24–204(a)) is an extraordinary procedure, equivalent to a certificate of rehabilitation. Appellant contends further the impeachment use of his prior conviction was highly prejudicial in that the jury was likely to conclude that someone convicted of murder would illegally possess a handgun, and that the case was a close credibility contest between the testimony of appellant and the arresting officers which had, in fact, resulted in a hung jury at the earlier trial.[4] At a pretrial hearing on defendant's motion to bar use of the prior conviction, the trial judge ruled that the grant of a reduction of minimum sentence under § 24–201c did not rise "to the dignity of an equivalent of a certificate of rehabilitation." We agree.

The meaning of the rather indefinite term "certificate of rehabilitation ·or its equivalent" in § 14–305(b)(2)(A)(ii) is an issue of first impression in this court. We should look therefore to its legislative history to ascertain its intended import. This provision of the statute was based on the proposed Federal Rule of Evidence 609(c), as submitted by the Advisory Committee on Rules of Practice and Procedure of the Judicial Conference of the United States in March, 1969. H.R.Rep.No.907, 91st Cong. 2d Sess. 61–63 (1970); H.R.Rep.No.1303, 91st Cong., 2d Sess. 231 (1970). The proposed rule provided:

(c) Effect of Pardon, Annulment, or Certificate of Rehabilitation. Evidence of a conviction is inadmissible under this rule if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure, and (2) *the procedure under which the same was granted or issued required a substantial showing of rehabilitation* or was based on innocence. [10 Moore's Federal Practice § 609.01, at VI–99 (2d ed. 1976) (emphasis supplied).]

The express provision in the proposed Federal Rule that the procedure requires "a substantial showing of rehabilitation" was not carried over into the D.C. Code provision. There is no indication in the legislative history that this omission had any significance, however. Rather, the two provisions were considered to be "essentially the same." H.R.Rep.No.907, *supra* at 61–62; H.R.Rep.No.1303, *supra* at 231.[5] The Ad-

4. At the earlier trial, the trial judge also permitted the government to make impeachment use of the prior conviction and allowed the defense counsel to refer to the fact that the defendant had received a reduction in sentence. Defense counsel was not permitted to refer to rehabilitation.

5. The Federal Rule as finally adopted contained additional language changes:

(c) Effect of pardon, annulment, or certificate of rehabilitation.–Evidence of a conviction is not admissible under this rule if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a *finding* of the rehabilitation of the person convicted, and that person has *not* been convict-

ed of a subsequent crime which was punishable by death or imprisonment in excess of one year, or (2) the conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence. [10 Moore's Federal Practice, *supra* at VI–95 (emphasis supplied).]

There has been very little case law interpreting the "equivalent procedure" language of the Federal Rule. *See United States v. Wiggins,* 566 F.2d 944 (5th Cir.), *cert. denied,* 436 U.S. 950, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978) (release from halfway house where witness had been placed as a condition of probation not equivalent to a certificate of rehabilitation because objectives of institution and qualifications for release not demonstrated at trial); *United States v. DiNapoli,* 577 F.2d 962 (2d

visory Committee's note to the 1969 Draft of the proposed rule sheds light on the rationale for requiring a showing of rehabilitation:

> *Subdivision (c).* A pardon or its equivalent granted solely for the purpose of restoring civil rights lost by virtue of a conviction has no relevance to an inquiry into character. If, however, the pardon or other proceeding is hinged upon a showing of rehabilitation the situation is otherwise. The result under the rule is to render the conviction inadmissible. [10 Moore's Federal Practice, *supra* at VI–102.]

Thus, the intent of this provision of the rule is to shield from impeachment those persons who, although previously convicted of a crime, have nevertheless achieved such a level of character rehabilitation that the prior conviction no longer has any relevance to the witness' credibility.

Appellant contends the Parole Board's application for a reduction of his minimum sentence under § 24–201c was such a showing of his rehabilitation. In their Information Supporting Application for Reduction of Minimum Sentence in appellant's case, the Parole Board cited appellant's "trustworthiness," "excellent cooperation," and "consistent efforts to rehabilitate himself." It concluded:

> [A]fter careful consideration and a thorough study of Williams' record during his confinement for more than eight (8) years, the Board believes that Williams has responded to the rehabilitative programs available to him in a positive manner and that his adjustment has been excellent. The Board further believes that Charles A. Williams will live and remain in the community without violating the law and that his immediate release into the community would not be incompatible with the welfare of society
> . . . .

A consideration of the legislative history and purposes of § 24–201c and the overall parole scheme in the District of Columbia leads us to the conclusion that the reduction in minimum sentence provided by § 24–201c requires a finding only that the prisoner has responded well to the rehabilitation program *of the correctional facility* such that his continued incarceration would serve no further useful purpose. In other words, a finding that the prisoner is sufficiently rehabilitated for parole is not equivalent to a finding that he has been so completely rehabilitated that the probative value of his conviction on the issue of his credibility has been diminished.

The parole system serves several broad purposes in correctional policy, among which are balancing sentencing disparities, weighing the expense to society of continued incarceration of an offender against the likelihood of his future criminal acts, and determination of when a prisoner's rehabilitation will be aided by the opportunity to function as a responsible citizen. *See* S.Rep.No.369, 94th Cong., 2d Sess. 16–17, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 335, 337–38 (legislative history of Parole Commission Reorganization Act, Pub.L.No.94–233, 18 U.S.C. §§ 4201, *et seq.*). The paroled prisoner remains in the legal custody and control of the Attorney General of the United States until the expiration of his maximum term. D.C. Code 1973, § 24–204(a).

The legislative history of § 24–201c indicates that it was intended to enable the Parole Board "to individualize the handling of the cases as well as correct the great disparity in meting out sentences that now exist [sic]," H.R.Rep.No.451, 80th Cong., 1st Sess. 2 (1947):

> Section 4 authorizes the Board to apply to the court which has imposed sentence on a prisoner for a reduction of the minimum sentence of such prisoner when it appears to the Board that there is a rea-

Cir.), *cert. denied,* 434 U.S. 858, 98 S.Ct. 181, 54 L.Ed.2d 130 (1977) (New York certificate of relief from disabilities not equivalent to a certificate of rehabilitation because issued as an aid to rehabilitation, not pursuant to a finding of

rehabilitation); *United States v. Thorne,* 547 F.2d 56 (8th Cir. 1976) (trial court has discretion to examine witness and make finding of rehabilitation).

sonable probability that the prisoner will live and remain at liberty without violating the law. The court is given authority to pass upon the application at any time prior to the expiration of the minimum sentence, no hearing being required. This provision will permit a court, in its discretion, to correct a mistake in imposing too long a minimum sentence, but only after the Board has found the required facts. [*Id.* at 6.] [6]

That invocation of this provision was not intended to embody a determination by the Parole Board that a prisoner has been fully rehabilitated can be seen by a comparison of § 24–201c with § 24–204(b) (a section of the parole statute), which provides:

(b) Notwithstanding the provisions of subsection (a) of this section, the District of Columbia Council promulgate [sic] rules and regulations under which the Board of Parole, in its discretion, may discharge a parolee from supervision prior to the expiration of the maximum term or terms for which he was sentenced.

The legislative history of § 24–204(b) clearly indicates that Congress equated rehabilitation with discharge from parole supervision and not with eligibility for early parole: [7]

[T]he Board of Parole recommends, and the Commissioners concur in its recommendation, that the Board be given authority to discharge from supervision persons who have been under supervision for a long period, where it appears to the Board that *their rehabilitation has been accomplished* and no further useful purpose would be served by maintaining them under parole supervision. [H.R. Rep.No.179, 89th Cong., 1st Sess. 4 (1965) (emphasis supplied).]

Thus, we conclude that the grant of a reduction of minimum sentence so as to render a prisoner eligible for parole is not the equivalent of a certificate of rehabilitation.[8] Further, it does not evidence a de-

---

**6.** We note that the standard of § 24–201c, "a reasonable probability that the prisoner will live and remain at liberty without violating the law," parallels the standard of the parole statute, § 24–204. This formula is not, therefore, another way of saying that a prisoner is fully rehabilitated. If it were (apart from there being by definition no further need for parole supervision), all parolees would arguably be exempt from impeachment with their prior convictions, a result clearly not intended by the statute nor urged by appellant.

**7.** The Advisory Committee notes to the 1969 Draft of Federal Rule 609 stated that "[a] similar provision is contained in California Evidence Code § 788." 10 Moore's Federal Practice, *supra* at VI–102. That provision prohibits impeachment with a prior conviction for which a certificate of rehabilitation has been granted under the penal code. Cal.Evid.Code § 788 (1966). Section 4852.01 *et seq.* of the California Penal Code (West Supp. 1970) provides that persons convicted of a felony and released on completion of their sentence or on probation or parole, or those whose convictions have been expunged, may apply to the court for a certificate of rehabilitation after completion of a period of rehabilitation consisting of three years residence plus additional time computed on the basis of the nature of the offense and the maximum sentence. § 4852.03. Upon receipt of the application the court conducts a hearing at which wide–ranging inquiry into the petitioner's criminal record and rehabilitation is

permitted, §§ 4852.05–.12, and the court may deny the petition on proof of violation of law during the rehabilitation period, § 4852.11. If the court finds that the petitioner has demonstrated his rehabilitation, it will declare him rehabilitated and recommend to the governor that he be pardoned. § 4852.13. The statute expressly provides, however, that an application for a certificate of rehabilitation may not even be filed until both the statutory period of rehabilitation and *the term of parole or probation have expired.* § 4852.06.

**8.** In deciding that § 24–201c relief is not the equivalent of a certificate of rehabilitation under § 14–305(b)(2)(A)(ii), we intimate no views as to what, if any, procedures in the District of Columbia might qualify under the statute. We note, however, that the Federal Youth Corrections Act, 18 U.S.C. § 5021 does provide for the *unconditional* discharge of youth offenders before the expiration of the maximum sentence or period of probation and for the issuance of a certificate to that effect. This provision was intended to be invoked for the benefit of a youth offender "[i]f he has responded to treatment and the Youth Division is of the opinion that his *rehabilitation has been accomplished.*" H.R.Rep.No.2979, 81st Cong., 2d Sess., *reprinted in* [1950] U.S.Code Cong. Serv. pp. 3983, 3992 (emphasis supplied). D.C. Code 1973, § 24–204(b), similarly provides for unconditional discharge from supervision prior to the

gree of rehabilitation sufficient to overcome the relevance of a prior conviction to the witness' credibility.[9]

Appellant next contends he was denied effective assistance of counsel because trial counsel failed to seek out the only arguably disinterested witness in his behalf. Noting that both of the defense witnesses, appellant's half brother and his half brother's girl friend, were close to him, and that the central issue in the case was his credibility vis-à-vis the arresting officer, appellant argues that trial counsel's pretrial investigation was inadequate because he failed to obtain police records of the stop which would have enabled him to locate the Mr. Fisher who was present at the arrest.

■■■ A defendant's Sixth Amendment right to effective assistance of counsel is violated if there has been gross incompetence of counsel which has in effect blotted out the essence of a substantial defense. *Angarano v. United States*, D.C.App., 312 A.2d 295, 298 n.5 (1973), adopting the standard of *Bruce v. United States*, 126 U.S. App.D.C. 336, 339–40, 379 F.2d 113, 116–17 (1967). As a general rule, "[c]ounsel has a duty to conduct an independent investigation of the facts and circumstances of a given case." *Oesby v. United States*, D.C. App., 398 A.2d 1, 8 n.14 (1977). This is especially important where the central issue is the relative credibility of the defendant and key government witnesses. *See Farrell v. United States*, D.C.App., 391 A.2d 755, 761 & n.2 (1978). Although in *Angarano v. United States, supra* at 301, we acknowledged the possibility that failure to call a witness or investigate possible facts may amount to ineffectiveness of counsel, in *Woody v. United States*, D.C.App., 369 A.2d 592, 594 (1977), we concluded that failure to locate an unknown witness whom defendant claimed was present at the scene of the crime was not ineffective assistance of counsel.

"[A] substantial defense lost due to incompetence must be shown to be a defense as a matter of law and available from facts known or obvious to the trial attorney." *Id.* at 594. In other words, does the incompetence of counsel asserted by a defendant, if true, entitle him to relief? *Angarano v. United States, supra* at 298. "This court, of course, will not engage in vague speculation about the kind of investigation trial counsel might have made or what witnesses he might have called." *Atkinson v. United States*, D.C.App., 366 A.2d 450, 453 (1976). Appellant has made no showing that Mr. Fisher would have been available for trial or what the nature of his testimony might have been.[10] Our review of the record leads

9. *Cf. Taylor v. Montgomery*, D.C.App., 413 A.2d 923 (1980); *Bradford v. District of Columbia Hacker's License Appeal Board*, D.C.App., 396 A.2d 988, *cert. denied*, 441 U.S. 949, 99 S.Ct. 2174, 60 L.Ed.2d 1053 (1979); *Debruhl v. District of Columbia Hacker's License Appeal Board*, D.C.App., 384 A.2d 421 (1978) (upholding constitutionality of licensing regulations which relate parole status to untrustworthiness).

10. Apart from the absence of Fisher's testimony at trial, appellant has alleged no facts which tend to show that trial counsel in fact failed to adequately investigate Mr. Fisher's identity, or that the failure to call him was not a tactical decision. The record of the second trial reveals that counsel did question the police officers about the full name of Mr. Fisher and whether they had made a record of it. (Tr. at 15–16, 27). At one point appellant's own testimony seems to indicate that counsel was already in possession of the identities of the missing witnesses:

expiration of the maximum term of the sentence. Although this provision does not afford the additional remedy of setting aside the conviction, as does the Federal Youth Corrections Act, we do not view such expungement as necessary to a showing of rehabilitation. There is no provision in the D.C. statute for a certificate evidencing such discharge. Finally, we note that in *United States v. Thorne, supra*, a witness was shielded from impeachment under Federal Rule 609(c), although he had no formal document or certificate of rehabilitation, when the trial court, after questioning the witness, found that he was rehabilitated. On appeal, the trial judge's discretion to make such a finding of rehabilitation on that particular record was upheld as the equivalent of a certificate of rehabilitation. Appellant in the instant case, however, presented no independent evidence of his rehabilitation remotely resembling such a showing to the trial court, relying entirely on the grant of a reduction of his minimum sentence under § 24–201c.

us to conclude that Mr. Fisher's testimony would have been at best cumulative and at worst contradictory to his defense. Testimony about Mr. Fisher's identity was conflicting, even among the defense witnesses. Appellant testified that he arrived alone in his car and got out, whereupon he and two unknown passersby (of whom one is alleged to be Mr. Fisher) were summoned together to the police scout car. Mr. Watkins testified that he first saw appellant that day coming down the street and that appellant was walking alone when stopped by the police. Ms. Russ testified that appellant and Mr. Watkins arrived together in appellant's car and that appellant was standing by the car alone when he was apprehended. The arresting officers, on the other hand, testified that they had observed appellant and Mr. Fisher walking and talking together in the area for some time.

In *Johnson v. United States*, D.C.App., 413 A.2d 499 (1980), we held that "a 'substantial defense' is 'blotted out' when *highly credible evidence* which would have impeached the credibility of a key government witness is lost through incompetence." *Id.* at 504 (emphasis supplied). Appellant contends Fisher was a disinterested witness who would have rebutted the testimony of the police officer. Whether Fisher's testimony in fact would have established that appellant was not in possession of the gun, however, is purely a matter of conjecture. Defendants face a "heavy burden of proving prejudice" in asserting a claim of ineffective assistance of counsel. *Thornton v. United States*, D.C.App., 357 A.2d 429, 435, *cert. denied*, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976). Here, appellant has failed to establish any link between the missing testimony and the loss of "a substantial defense ... as a matter of law ... available from facts known or obvious to

the trial attorney." *Woody v. United States, supra* at 594. Indeed, even if Fisher would have testified as appellant contends, his testimony, while perhaps of greater weight because it was allegedly disinterested, would only have been cumulative of the consistent testimony of the three defense witnesses that the police retrieved the gun from the bushes. We cannot say that failure to present such a witness rises to the level of constitutional ineffectiveness.

■■■ Appellant's final contention is that he was denied his Sixth Amendment right to a speedy trial by the delay between his first and second trials. The test enunciated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972), requires consideration of four factors in evaluating an appellant's speedy trial claim: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. The lapse of more than one year gives prima facie merit to a claim that an accused has been denied his right to a speedy trial, *Bethea v. United States*, D.C. App., 395 A.2d 787, 790 (1978); *United States v. Bolden*, D.C.App., 381 A.2d 624, 627 (1977); *Branch v. United States*, D.C. App., 372 A.2d 998, 1000 (1977), (shifting the burden to the government to justify the delay). Nevertheless, the claim must still be evaluated in light of the other three *Barker* factors. *Reid v. United States*, D.C. App., 402 A.2d 835, 837–38 (1979); *Bowman v. United States*, D.C.App., 385 A.2d 28, 30 (1978).

■■ After appellant's first trial ended in a mistrial in April 1976, a new trial was scheduled for July 7, 1976. Of the approximately 21 months which elapsed between that date and the actual commencement of his second trial of April 11, 1978, approxi-

---

Q. And then what happened?
A. I told you, the scout car pulled in at Sigsbee Place off 12th Street. It was two gentlemen walking across the street, which one's name come out to be Fisher and the other one was–*May I ask my lawyer*, Your Honor?
The Court: No, sir, just what you remember, of course.

The Witness: I think his name was Clarence somebody; I don't know.
Mr. Roberts: Do you know either of those two individuals?
A. No, sir.
(Tr. at 74–75) (emphasis supplied).

mately ten months are attributable to continuances made at defense request, or granted because of illness and withdrawal of defense counsel or failure of defendant to appear. Approximately five months are attributable to two government–requested continuances and the remaining six months to institutional delays because the trial court was unavailable. There is no evidence that the delay is attributable to "arbitrary, purposeful, oppressive, or vexatious action" by the government. *Strickland v. United States,* D.C.App., 389 A.2d 1325, 1330 (1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979). Although the prosecution is usually charged with institutional delays, *see United States v. Perkins,* D.C.App., 374 A.2d 882, 883 (1977), the government is not faulted as strongly for delays inherent in the judicial system as it is for those attributable to its own deliberate action. *Reed v. United States,* D.C. App., 383 A.2d 316, 319, *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978); *United States v. Perkins, supra.*

Appellant was not incarcerated during this period and his claim that the delay hampered his trial preparation is wholly without merit. Furthermore, appellant failed to raise his speedy trial claim any time prior to appeal. Reviewing all the circumstances in light of the *Barker* test, we conclude that appellant was not denied his right to a speedy trial.

Accordingly, appellant's conviction must be

Affirmed.